**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **RICKY R. FRANKLIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action File No.** |
| | ) **1:19-CV-03853** |
| **GEORGIA POWER COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Plaintiff Ricky R. Franklin alleges Georgia Power Company ("Georgia Power") violated the Telephone Consumer Protection Act (the "TCPA") by sending him unsolicited Short Message Service ("SMS" or "text") messages. Complaint, Doc. 3, at ¶¶ 25–27 (containing a sole count—Count I—under the TCPA). Specifically, Franklin claims Georgia Power violated 47 U.S.C. § 227, which, in relevant part, prohibits making "any call . . . using an automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A). Franklin does not allege Georgia Power contacted him with any artificial or prerecorded voice messages, *see* Complaint, Doc. 3, at ¶ 26 (alleging only the use of an autodialer), and the undisputed record shows no such voice messages exist. As

such, "[w]hether [Georgia Power used] an ATDS is the threshold issue for establishing [Franklin's] TCPA claim."[1]

The Supreme Court recently held, in its unanimous decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), that "[t]o qualify as an [ATDS], a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id.* at 1167. The plain, undisputed facts show neither Georgia Power nor its two relevant third-party vendors use equipment that has the capacity "either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id.* Because Georgia Power did not use an "automatic telephone dialing system," no TCPA violation occurred. 47 U.S.C. § 227(b)(1)(A).

"That ends this case,"[2] and the Court need not go further. But even if the Court finds Georgia Power used an ATDS (which it did not), the Court should still grant Georgia Power judgment as a matter of law because it reasonably relied upon prior express consent to text the at-issue phone number, and no one—Franklin included—

---

[1] *Gary v. TrueBlue, Inc.*, No. 17-cv-10544, 2018 WL 3647046, at *8 (E.D. Mich. Aug. 1, 2018).

[2] *See Barry v. Ally Financial, Inc.*, No. 20-12378, 2021 WL 2936636, at *4 (E.D. Mich. July 13, 2021) (finding no ATDS existed because texts were targeted to individuals, not bulk batched).

ever revoked that consent. By receiving purportedly unwanted texts from Georgia Power without making even the slightest attempt to stop them, Franklin has removed himself from the zone of harm the TCPA intended to protect, and cannot bring this suit.

Finally, were the Court to find Georgia Power used an ATDS to send text messages to Franklin without consent to do so, it still should rule in Georgia Power's favor because the TCPA itself was unconstitutional at all relevant times in this matter.  In *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("*AAPC*"), the Supreme Court held that the TCPA, as written, was an unconstitutional, content-based suppression on speech. Thus, at the time the texts at issue here were placed, the TCPA was an unconstitutional, content-based restriction on speech.

For these and the reasons stated below, "no genuine dispute as to any material fact [exists], and [Georgia Power] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## UNDISPUTED, MATERIAL FACTS

## I. The Account.

Franklin's Complaint alleges Georgia Power sent him 42 unsolicited text messages, without his prior consent, beginning on October 4, 2018, and ending on November 21, 2018.  Complaint, Doc. 3, at ¶¶ 20, 21; *see also* Text Messages,

attached to Georgia Power's Statement of Undisputed Material Facts as Exhibit A.[3] The messages at issue related to Georgia Power account number 32309-49222 (the "Account").  Complaint at ¶ 20; Declaration of Jeremy Bowden ("Georgia Power Dec."), attached to Georgia Power's Statement of Undisputed Facts as Exhibit C, at ¶ 4.  The Account was a "PrePay" account, active from November 10, 2016, until November 24, 2018.  Georgia Power Dec., Ex. C, at ¶ 5; Georgia Power's Responses to Plaintiff's First Interrogatories ("Interrogatory Responses"), attached to Georgia Power's Statement of Undisputed Facts as Exhibit D,  at 3.  With a PrePay account, the customer deposits an amount of funds with Georgia Power, and Georgia Power draws against that deposit as the customer incurs charges for utility services.  Georgia Power Dec., Ex. C, at ¶ 6; Interrogatory Responses, Ex. D, at 4.  The only telephone number associated with the Account was (404) 287-4934 (the "Phone Number").  Georgia Power Dec., Ex. C, at ¶ 5.

---

[3] Franklin produced these text messages in response to Georgia Power's Requests for Production.  *See* Franklin's Responses to Georgia Power's First Interrogatories and Requests for Production, attached to Georgia Power's Statement of Undisputed Facts as Exhibit B, at 14.  In response to Georgia Power's Interrogatory No. 2, which requested Franklin identify "each call [he] received from Georgia Power," Franklin directed Georgia Power to these messages.  *See id.* at 10.

## II.    The Account's Preference for Text Messages.

Georgia Power sends targeted text messages to its PrePay customers who have consented to receive such messages.  *See* Georgia Power Dec., Ex. C, at ¶¶ 7–8, 17; Interrogatory Responses, Ex. D, at 5.  When a Georgia Power customer enrolls in a PrePay account, the customer provides Georgia Power with certain contact information, including a phone number.  Georgia Power Dec., Ex. C, at ¶ 11. Additionally, the customer is required to select a "notification preference" for receiving notifications concerning the customer's account balance, enrollment, pending disconnects, and other messages.  *Id.* at ¶ 7.  Available notification preferences include text messaging and email.  *Id.* at ¶ 8.  Georgia Power's records show that on November 11, 2016, the then holder of the Phone Number affirmatively opted in and consented to receive text messages at the Phone Number.  *Id.*; Interrogatory Responses, Ex. D, at 4.  No opt-out or revocation of that consent appears in the records.  Georgia Power Dec., Ex. C, at ¶ 8; Interrogatory Responses, Ex. D, at 4.

## III.    Creating PrePay Account Notifications.

Since 2014, Georgia Power, through its agent Southern Company Services, has contracted with EnergyComNetwork, Inc. ("PayGo"), which provides a platform that allows Georgia Power's PrePay customers to monitor their accounts.  Georgia Power Dec., Ex. C, at ¶¶ 9–10; Declaration of Jared Gilstrap ("PayGo Dec."),

attached to Georgia Power's Statement of Undisputed Facts as Exhibit E, at ¶¶ 4–5; Interrogatory Responses, Ex. D, at 4.  When a Georgia Power customer enrolls in a PrePay account, Georgia Power transmits the customer's information to PayGo. Georgia Power Dec., Ex. C, at ¶ 12; PayGo Dec., Ex. E, at ¶ 6.  PayGo then creates a customer-specific account and manages the PrePay PayGo account.  Georgia Power Dec., Ex. C, at ¶ 12; PayGo Dec., Ex. E, at ¶ 6.  Customers also have the ability to enter information into their PayGo account themselves directly after its creation.  PayGo Dec., Ex. E, at ¶ 7.  In all events, either the customer or a Georgia Power representative acting at the customer's direction manually enters customer data; it is never randomly or sequentially generated by any computer system. Georgia Power Dec., Ex. C, at ¶¶ 13–14; Interrogatory Responses, Ex. D, at 4.

PayGo monitors customers' accounts for the occurrence of certain events ("Triggering Events"), such as a low balance.  Georgia Power Dec., Ex. C, at ¶ 15; PayGo Dec., Ex. E, at ¶ 8; Interrogatory Responses, Ex. D, at 4.  When a Triggering Event occurs, PayGo's system notifies Georgia Power.  Georgia Power Dec., Ex. C, at ¶ 16; PayGo Dec., Ex. E, at ¶ 9; Interrogatory Responses, Ex. D, at 4.  PayGo does not generate a notification if a Triggering Event does not occur; all notifications related to a customer are directly tied to the occurrence of specific events concerning that individual customer's account.  PayGo Dec., Ex. E, at ¶ 10.  The notification

informs Georgia Power of the Triggering Event and identifies the phone number associated with the account on which the Triggering Event occurred. Georgia Power Dec., Ex. C, at ¶ 16; PayGo Dec., Ex. E, at ¶ 9; Interrogatory Responses, Ex. D, at 4. Upon receipt of the individualized notification from PayGo, Georgia Power's system generates a text-based, non-voice message, drafted by Georgia Power, to send to the affected customer at the phone number associated with the relevant account concerning the Triggering Event. Georgia Power Dec., Ex. C, at ¶ 17; Interrogatory Responses, Ex. D, at 5. None of the systems PayGo maintains related to providing services to Georgia Power has the capacity to store or produce a telephone number using a random or sequential number generator. PayGo Dec., Ex. E, at ¶ 12.

## IV.   Pushing the Notification.

To send that message (or notification) to the customer, Georgia Power, through its agent Southern Company Services, contracts with Twilio Inc. ("Twilio"). Georgia Power Dec., Ex. C, at ¶ 18. Twilio provides a Programmable SMS application programming interface ("API") that connects Georgia Power's software to telecommunications networks, allowing Georgia Power to transmit SMS messages. *Id.* at ¶ 19; Declaration of Martin Price ("Twilio Dec."), attached to Georgia Power's Statement of Undisputed Facts as Exhibit F, at ¶ 4; Interrogatory Responses, Ex. D, at 5. In order for Georgia Power to transmit a message via

Twilio's Programmable SMS API, Georgia Power must provide Twilio with an individual, message-specific instruction (a/k/a an API request) to transmit the message.  Georgia Power Dec., Ex. C, at ¶¶ 20–21; Twilio Dec., Ex. F, at ¶¶ 5–6, 8. That instruction must contain (1) the individual phone number to which the message is to be sent; (2) reference to valid Twilio-owned phone numbers assigned to Georgia Power from which to send the message; and (3) the message's text content.  Georgia Power Dec., Ex. C, at ¶ 20; Twilio Dec., Ex. F, at ¶ 9; Interrogatory Responses, Ex. D, at 5.  Twilio does not store, produce, or generate recipient phone numbers for the purpose of sending SMS messages through the Programmable SMS API; Georgia Power must provide a single target phone number in the instruction for every message.  Georgia Power Dec., Ex. C, at ¶ 22; Twilio Dec., Ex. F, at ¶¶ 10–11; Interrogatory Responses, Ex. D, at 5.  Once Twilio receives a complete and valid instruction, the message is immediately, and individually, sent to the customer by being pushed into the telecommunications network or, if there is an issue with rate limitations, placed in a queue to be pushed when limitations allow.  Georgia Power Dec., Ex. C, at ¶ 23; Twilio Dec., Ex. F, at ¶ 7; Interrogatory Responses, Ex. D, at 5.  Twilio has provided services to Georgia Power since 2012.  Twilio Dec., Ex. F, at ¶ 13.  Twilio's systems do not have the capacity to store or produce a telephone

number using a random or sequential number generator.  *Id.* at ¶ 12; *see also* Interrogatory Responses, Ex. D, at 5.[4]

## V.     Contacts with the Phone Number.

Georgia Power's records and documents produced by Franklin in discovery show the only attempts to contact the Phone Number were via the text-based notification process described above.  *See* Georgia Power Dec., Ex. C, at ¶¶ 26–28; Text Messages, Ex. A, Interrogatory Responses, Ex. D, at 5. Georgia Power only sent messages to the Phone Number from November 11, 2016, to November 27, 2018.  Georgia Power Dec., Ex. C, at ¶ 28; *see also* Spreadsheet of Messages, attached to Georgia Power's Statement of Undisputed Material Facts as Exhibit G.[5] At no point did Georgia Power send the Phone Number an artificial or prerecorded voice message.  Georgia Power Dec., Ex. C, at ¶ 27; Interrogatory Responses, Ex. D, at 5–6. Georgia Power never attempted to call the Phone Number or connect to the Phone Number with an audio message of any kind.  Georgia Power Dec., Ex. C,

---

[4] Georgia Power described this process for sending text message alerts to phone numbers related to PrePay accounts in its responses to Franklin discovery requests. *See* Interrogatory Responses, Ex. D, at 3–6.  Georgia Power also identified the declarants for Georgia Power, PayGo, and Twilio. *Id.* at 2–3.

[5] Georgia Power produced this spreadsheet to Franklin in response to Franklin's Requests for Production.  *See* Georgia Power's Responses to Franklin's First Request for Production Directed to Defendant, attached to Georgia Power's Statement of Undisputed Material Facts as Exhibit H, at 8, 10.

at ¶ 26; Interrogatory Responses, Ex. D, at 5–6.  Furthermore, none of the systems used to contact the Phone Number automatically dialed and/or texted the Phone Number from a preproduced list of phone numbers.  Georgia Power Dec., Ex. C, at ¶ 27.  Each text-based notification—and all communications with the Phone Number were text-based notifications—was generated and sent to the Phone Number individually in response to a specific occurrence regarding the Account.  *Id.*  For example, on October 10, 2018, Georgia Power sent the following message to the Phone Number concerning the receipt of a payment:



Text Messages, Ex. A, at 3; *see also* Spreadsheet of Messages, Ex. G, at 1 (showing Georgia Power's record of the message being sent).  The other messages sent to the phone number contain similar account notifications.  *See, e.g.*, Text Messages, Ex. A, at 5 (message on October 19, 2018: "Your power at 415 FAIRBURN may be turned off soon."); *id.* at 7 (message on October 28, 2018: "You have $8.71 on your account at 415 FAIRBURN, approx. 1 days remain based on daily usage of 32

kWh."); *id.* at 12 (message on November 18, 2018: "$25.00 PMT recvd.  If off, power should be on within 4 hrs.").

In addition, none of the systems Georgia Power maintains for communicating with PrePay customers or that were used to contact the Phone Number has or ever had the capacity to store or produce telephone numbers using a random or sequential number generator.  Georgia Power Dec., Ex. C, at ¶ 24; Interrogatory Responses, Ex. D, at 6.  Neither do those systems have, nor have they ever had, the capacity to generate telephone numbers by any means.  Georgia Power Dec., Ex. C, at ¶ 25; Interrogatory Responses, Ex. D, at 6.  All telephone numbers must be manually entered, one-by-one, into these systems.  Georgia Power Dec., Ex. C, at ¶ 25; Interrogatory Responses, Ex. D, at 6.

Apart from this lawsuit, Franklin has never contacted Georgia Power concerning the messages at issue here.  Georgia Power Dec., Ex. C, at ¶ 29; *see* Franklin's Responses to Georgia Power's First Interrogatories and Requests for Production, Ex. B, at 10–11 (identifying the Text Messages as the only communications between Franklin and Georgia Power).

## ARGUMENT AND CITATION OF AUTHORITY

### I.  Summary Judgment Standard.

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

When reviewing a motion for summary judgment, a court "construe[s] the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party." *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).  However, factual disputes should only "be resolved in the nonmoving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts." *Id.*

## II. No equipment used to send text messages to Franklin's alleged phone number can store or produce numbers using a random or sequential number generator, nor did Georgia Power send that phone number any messages containing an artificial or prerecorded voice.

Franklin's sole count and allegation in this case claims that Georgia Power violated 47 U.S.C. § 277(b)(1)(A) by sending him text messages "using an automatic dialing system or an artificial or prerecorded voice" without his consent. But the undisputed facts show Georgia Power used neither an automatic dialing system nor

a prerecorded voice in connection with the sent messages. Accordingly, Georgia Power is entitled to summary judgment.

### A. Georgia Power never sent the Phone Number an artificial or prerecorded voice message.

Franklin makes no allegation he received any voice calls or messages from Georgia Power, only text messages. Complaint at ¶ 26. That alone is sufficient to defeat any claims Georgia Power violated the TCPA with regards to artificial or prerecorded voice messages. *See Ferguson v. Innovate Loan Servicing Corp.*, No. 1:18-cv-03071-ELR-LTW, 2020 WL 1467361, at *7 (N.D. Ga. Jan. 13, 2020) (holding summary judgment is appropriate where the plaintiff did not present evidence "that Defendant used an ATDS or an artificial or prerecorded voice"), *report and recommendation adopted*, 2020 WL 1467254 (N.D. Ga. Feb. 4, 2020); *Hudson v. Babilonia*, 192 F. Supp. 3d 274, 296–97 (D. Conn. 2016) (granting summary judgment because there was insufficient evidence in the record to establish the defendants used artificial or prerecorded voices). Even if he had, such allegations lack any supporting evidence.  Georgia Power never sent an artificial or prerecorded voice message to the Phone Number, and no voice messages exist here at all. Georgia Power Dec., Ex. C, at ¶ 26; *see also* Text Messages, Ex. A.  Put bluntly, Georgia Power never sent the Phone Number a message containing an artificial or prerecorded voice message. Georgia Power Dec., Ex. C, at ¶ 26; Interrogatory

Responses, Ex. D, at 5–6. Consequently, the "artificial or prerecorded voice" element is not at issue here. *See Stark v. Bridgepoint Benefits, LLC*, 3:19-cv-01740-AJB-AGS, 2021 WL 347695, at *2 (S.D. Cal. Feb. 2, 2021) (distinguishing between text messages and "artificial or prerecorded voice messages"); *Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (rejecting the argument text messages use an "artificial or prerecorded voice" in part because plaintiff "present[ed] no authority for the argument that a text message can have a "voice").

**B.**     **No equipment that sent the Phone Number a message can store or produce numbers using a random or sequential number generator.**

The undisputed evidence shows Georgia Power does not use, and did not use at the time Franklin alleges he received the 42 text messages, an ATDS. The TCPA actually defines "ATDS," stating it is any "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Earlier this year, the Supreme Court found those words mean exactly what they say. Specifically, in *Facebook, Inc.*, the Supreme Court settled a long held fight by addressing whether the phrase "using a random or sequential number generator" applied to both storing and producing telephone numbers. *See Facebook, Inc.*, 141 S. Ct. at 1167. All nine justices agreed it did, holding: "To qualify as an 'automatic

telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential number generator or to produce a telephone number using a random or sequential number generator." *See id.*; *see generally Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1306 (11th Cir. 2020) (holding that the statutory definition of an ATDS requires equipment must use randomly or sequentially generated numbers and not require human intervention).

The Supreme Court expressly recognized that "Congress defined an autodialer in terms of what it must do ('store or produce telephone numbers to be called') and how it must do it ('using a random or sequential number generator')." *Facebook, Inc.*, 141 S. Ct. at 1169. Hence, the Supreme Court specifically refused to adopt an overbroad definition that merely requires that a device have the capacity to store and automatically dial numbers (or send automated messages). *Id.* at 1171. The Court reasoned, "expanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel." *Id.* [6]

---

[6] In the wake of the *Facebook, Inc.* decision, some plaintiffs have attempted to argue the definition of ATDS includes systems where a random number generator selects numbers to call from a prepopulated list. *See, e.g.*, *Hufnus v. DoNotPay, Inc.*, No. 20-cv-08701-VC, 2021 WL 2585488, at *1 (N.D. Cal. June 24, 2021) (explaining, and rejecting, the plaintiff's argument). Those plaintiffs rely on a single line in a footnote of the *Facebook, Inc.* opinion as support for that argument. *See Facebook, Inc.*, 141 S. Ct. at 1172 n.7 ("For instance, an autodialer might use a random number

Given that holding, "liability [for using an ATDS] is triggered only if the automated system 'us[es] a random or sequential number generator' to store or produce the phone numbers that are called." *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 WL 2688622, at *5 (W.D. Tex. May 10, 2021) (second alteration in original); *accord Timms v. USAA Fed. Savs. Bank*, No. 3:18-cv-01495-SAL, 2021 WL 2354931, at *7 (D.S.C. June 9, 2021) (granting summary judgment where the defendant's systems could not "store or produce telephone numbers [using] a random or sequential number generator.").

Here, it is indisputable Georgia Power did not use an ATDS to send the messages alleged in the Complaint.   Indeed, there was nothing "random or sequential" about these messages.   All of the messages sent were individualized, targeted messages sent to the Phone Number upon the occurrence of an event concerning the Account, such as a low balance warning or a payment confirmation.

---

generator to determine the order in which to pick phone numbers from a prepopulated list."). Many courts have rejected this argument. *See Borden v. eFinancial, LLC*, No. C19-1430JLR, 2021 WL 3602479, at *5 (W.D. Wash. Aug. 13, 2021); *Hufnus*, 2021 WL 2585488, at *1; *Timms v. USAA Fed. Savs. Bank*, No. 3:18-cv-01495-SAL, 2021 WL 2354931, at *7 (D.S.C. June 9, 2021). Regardless, such an argument simply does not apply in this case because the undisputed record establishes Georgia Power sent the messages *individually* to the Phone Number based on *individualized* instructions resulting from the occurrence of specific events related to the Account. *See* Georgia Power Dec., Ex. C, at ¶ 28. No list of numbers was prepopulated, and no phone number to contact was randomly or sequentially selected. *See id.* at ¶ 27.

*See* Georgia Power Dec., Ex. C, at ¶¶ 27–28; *see also* Text Messages, Ex. A.  The

Phone Number was manually entered, not produced or generated in any fashion.  *See*

Georgia Power Dec., Ex. C, at ¶¶ 5, 14.   Each message was pushed into the

telecommunications networks, individually, based on message-specific instructions.

*Id.* at ¶¶ 20–21; Twilio Dec., Ex. F, at ¶ 7.[7]

In short sum, "these [texts] were targeted to [a] specific individual[ ] in

connection with [a] specific account[ ] held by Defendant.  That ends this case." *See*

*Barry v. Ally Financial, Inc.*, No. 20-12378, 2021 WL 2936636, at *4 (E.D. Mich.

July 13, 2021); *Perrong v. MLA Int'l, Inc.*, No. 6:20-cv-01606-RBD-EJK, 2021 WL

---

[7] It's worth noting that the TCPA says nothing about text messaging because "that medium did not exist in 1991." *Salcedo v. Hanna*, 936 F.3d 1162, 1166 (11th Cir. 2019).  The Federal Communications Commission ("FCC") has interpreted the use of the word "call" in the TCPA to cover text messages, and the Supreme Court noted the parties did not dispute the point in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016), and *Facebook, Inc.*, 141 S. Ct. at 1168, n.2.  However, whether "call" includes "text message" has not been affirmatively established.  *See Salcedo*, 936 F.3d at 1166, 1173 (concluding the plaintiff's "complaint facially appears to state a cause of action under the TCPA as interpreted by the FCC" but remanding for dismissal on other grounds); *see also Boardman v. Green Dot Corp.*, No. 3:21-CV-00174-FDW-DSC, 2021 WL 3699856, at *2, n.2 (W.D.N.C. Aug. 19, 2021) ("There remains the question of whether text messages, as opposed to phone calls, are covered by the TCPA.").

What has been established, though, is that even if the TCPA were to apply to text messages it only applies to those that are sent "using [an] automatic telephone dialing system." *Facebook, Inc.*, 141 S. Ct. at 1167; *see also id.* at 1168 (noting that the trial court dismissed Duguid's case because he "did not claim Facebook sent text messages to numbers that were randomly or sequentially generated" and therefore "failed to allege that Facebook used an autodialer").

3036462, at *2 (M.D. Fla. July 2, 2021) (holding "Plaintiff has failed to state a claim upon which relief can be granted" where "Plaintiff fail[ed] to allege 'the random nature of the automation device"). Because Franklin cannot present evidence to create a genuine issue of material fact on that critical element of his claim, Georgia Power is entitled to judgment as a matter of law.

## III.   Georgia Power reasonably relied on the affirmatively granted, never revoked consent of its customer.

The Court need not go further. The undisputed facts show that Georgia Power never used an ATDS or sent an artificial or prerecorded voice message with respect to the Phone Number. However, even if it had, it still didn't violate the TCPA because it had appropriate consent to send the non-marketing text messages at issue here. As such, Franklin's "no consent" claims fail for at least two other reasons. *First*, the Federal Communications Commission ("FCC") and various courts recognize a "safe harbor" that shields a caller from TCPA liability when the caller has a good faith belief that it has consent to call (as Georgia Power did here). *Second*, Franklin lacks jurisprudential standing because, as someone who believed his number was being wrongly used by a third party (but did nothing about it), he is outside the zone of interest the TCPA was enacted to protect.

### A.   The FCC's "Safe Harbor" protects Georgia Power from liability.

The TCPA generally prohibits the making of "any call (other than a call made for emergency purposes or made with the *prior express consent* of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service.'" *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1117 (11th Cir. 2014) (quoting 47 U.S.C. § 227(b)(1)) (emphasis and ellipses in *Mais*).

In implementing the TCPA, the FCC has recognized the existence of a "safe harbor" for calls mistakenly made to a wrong number after consent was obtained. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2015 Order"), 30 FCC Rcd. 7961, 8007 (July 10, 2015). In *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018), the D.C. Circuit went further, holding that the FCC should not have limited the safe harbor to one call. *Id.* at 706. Indeed, the D.C. Circuit highlighted one instance where "the new, post-reassignment subscriber waited to initiate a lawsuit until after having received almost 900 text alerts that were intended for the previous subscriber." *Id.* at 705. Limiting the safe harbor to *only* the first call was therefore deemed arbitrary. *Id.* at 706.

Instead, the D.C. Circuit endorsed a "reasonable reliance" standard, *i.e.*, whether the caller reasonably relied on prior express consent. *Id.* at 707. As the court

recognized in *ACA*, "a caller's reasonable reliance" does not "necessarily cease to be reasonable once there has been a single, post-reassignment call." *Id.* "The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment," especially if it goes unanswered. *Id.* Such is the case here where Franklin failed to respond to *any* of Georgia Power's text message notifications.  *See* Georgia Power Dec., Ex. C, at ¶ 29; Franklin's Responses to Georgia Power's First Interrogatories and Requests for Production, Ex. B, at 10–11. As such, Georgia Power continued reasonably to rely on the prior express consent it obtained to call the Phone Number provided to it. Georgia Power Dec., Ex. C, at ¶ 8; *cf. Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-cv-1721, 2014 WL 1744136, at *11 (S.D. Cal. Apr. 30, 2014), *aff'd*, 671 F. App'x 989 (9th Cir. 2016) (declining to impose liability on a business that has "a good-faith basis to believe that it had consent to contact Plaintiff at that number."); *Danehy v. Time Warner Cable Enterprises*, No. 5:14-CV-133, 2015 WL 5534094, at ** 7–8 (E.D.N.C. Aug. 6, 2015) (holding that "defendant's good faith belief that it had consent for the calls" precluded liability); *Sandoe v. Boston Scientific Corp.*, No. 18-11826, 2020 WL 94064, at ** 4–5 (D. Mass. Jan. 8, 2020) ("Although the text of the TCPA does not provide for reasonable reliance, this Court finds persuasive the FCC's order emphasizing that the TCPA does not require the impossible of callers. . . . Boston

Scientific reasonably relied on its partner clinics to provide an invitee list of current patients who had provided their contact information for health-care-related events and services.").[8]

**B.      Franklin is not within the TCPA's protected zone of interest.**

Franklin also lacks jurisprudential standing to pursue his "no consent" claim under § 227(b)(1)(A)(iii) of the TCPA because, by effectively ratifying the consent provided by Georgia Power's customer, Franklin is not within the zone of interest the statute was enacted to protect. "[A] statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interest protected by the law invoked.'" *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 709

---

[8] Following the *ACA* decision, the FCC continues to interpret the TCPA as having a safe harbor, and the FCC has undertaken to revise its safe harbor rules for wrong numbers. *See In re Advanced Methods to Target & Eliminate Unlawful Robocalls*, 33 FCC Rcd. 12024 (Dec. 13, 2018). As part of that effort, the FCC has directed the establishment of a national reassigned numbers database, which is currently under beta testing. *Id.* ¶ 11.While the process remains underway, courts continue to apply a safe harbor in cases where the caller had a good faith belief that it had the requisite consent. As one court explained in light of the *ACA* decision, whether the TCPA has been violated turns on the "reasonableness of the caller's reliance" on the express consent it received. *Roark v. Credit One Bank, N.A.*, No. 16-173 (PAM/ECW), 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018). For example, in *Roark*, the district court held that under the teaching of *ACA*, a company could reasonably rely on express consent it received to call a number, even when the call recipient turned out to be someone different. *Id.* That is especially true where the call recipient does not notify the caller of the wrong number. *Id.* In these circumstances, where the caller has "no reason to know that the phone number" does not belong to the person giving consent, it is reasonable for the caller to rely on its customer's prior express consent to call that number, "and therefore summary judgment on this issue is proper." *Id.*

(11th Cir. 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). In enacting the TCPA, Congress recognized consumer "outrage" over robocalls, finding that "unrestricted telemarketing . . . can be an intrusive invasion of privacy." Pub. L. No. 102–243, § 2, ¶¶ 5–6 (Dec. 20, 1991). Based on Congress's express findings, the zone of interest protected under § 227(b)(1)(A)(iii) includes "individual privacy rights, public safety interests, and interstate commerce." *Tel. Sci. Corp. v. Asset Recovery Sols., LLC*, No. 15-CV-5182, 2016 WL 4179150, at *12 (N.D. Ill. Aug. 8, 2016). It does *not* include call recipients who sit idly by while knowingly receiving calls meant for someone else. *See ACA Int'l*, 885 F.3d at 705 (disapproving of litigant who waited to initiate a lawsuit until after receiving numerous text messages intended for previous subscriber of phone number); *but see Drake v. FirstKey Homes, LLC*, 439 F. Supp. 3d 1313, 1327 (N.D. Ga. 2020) (declining to adopt reasonable reliance standard).

There is no dispute that Georgia Power (i) received affirmative consent to text the Phone Number, (ii) never received a revocation of that consent, (iii) never received a communication from Franklin of any kind, and (iv) sent all at-issue text messages *after* receiving affirmative consent. Georgia Power Dec., Ex. C, at ¶¶ 8, 28–29; Franklin's Responses to Georgia Power's First Interrogatories and Requests for Production, Ex. B, at 10–11. By failing to tell Georgia Power that the Phone

Number did not belong to him or otherwise instructing Georgia Power not to call the Phone Number again, Franklin placed himself outside the zone of interest that the TCPA was enacted to protect. *ACA Int'l*, 885 F.3d at 705.

## IV.    The TCPA was unconstitutional during the alleged text messages.

In *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("*AAPC*"),[9] the Supreme Court held that the TCPA, as written, was an unconstitutional, content-based suppression on speech. As a remedy, the Court severed the impermissibly content-based government-backed debt exception, but left the remainder of the TCPA intact. The Supreme Court, however, severed the government-backed debt exception on a going-forward basis. Thus, at the time the texts at issue here were placed, the TCPA was an unconstitutional, content-based restriction on speech. Therefore, even if the Court determines Georgia Power used an ATDS and could not reasonably rely on the affirmative consent granted to text the Phone Number, the Court still must find in favor of Georgia Power because Franklin filed his Complaint under a law that violated the First Amendment at the time of the calls at issue. *See Hussain v. Sullivan Buick-Cadillac-GMC Truck, Inc.*, 506 F. Supp.

---

[9] Because the Supreme Court decided the constitutional challenge to the automated-call ban in *AAPC,* Federal Rule of Civil Procedure 5.1 does not apply to the instant filing and a notice of constitutional challenge is not required. *See* Fed. R. Civ. P. 5.1. If the Court determines otherwise, Georgia Power will promptly file such a notice.

3d 1242 (M.D. Fla. 2020); *Creasy v. Charter Communs., Inc.,* 489 F. Supp. 3d 499

(E.D. La. 2020).[10]

As the *Hussain* and *Creasy* courts held, the TCPA was unconstitutional

between the enactment of the government-backed debt exemption in 2015 and when

the Supreme Court severed it from the remainder of the statute on July 6, 2020.

*Creasy*, 489 F. Supp. 3d at 506. The reasoning is simple: the Supreme Court held that

the TCPA as a whole was unconstitutional as written. *Id.* The statute only became

constitutional after the Supreme Court severed the government-backed debt

exemption on July 6, 2020. *Id*. Thus, all calls placed between 2015 and July 6, 2020—

which includes all of the texts at issue here—were placed at a time when the TCPA

was unconstitutional. *Id.*

The in-circuit opinion in *Hussain* framed it this way:

[T]he original TCPA statute restricted all robocall speech. The 2015
amendment, adding the government-debt exception, changed an
otherwise valid statute to an unconstitutional content-based
restriction. Thus, at the time Defendants engaged in the speech at issue
in this case, Defendants were subject to an unconstitutional content-

---

[10] *But see Lidenbaum v. Realgy, LLC*, No. 20-4252, 2021 WL 4097320 (6th Cir.
Sept. 9, 2021) (holding the government-backed debt exception did render application
of the FDCPA unconstitutional in all instances); *Moody v. Synchrony Bank*, No.
5:20-cv-61 (MTT), 2021 WL 1153036 (M.D. Ga. Mar. 26, 2021) (declining to
follow *Creasy*); *Bonkuri v. Grand Caribbean*, 513 F. Supp. 3d 1360 (S.D. Fla. 2021)
(same).

based restriction. Because the Court is without authority to enforce an unconstitutional statute, the Court lacks subject matter jurisdiction over this action.

*Hussain*, 506 F. Supp. 3d at 1245.

It is axiomatic that a defendant cannot be liable under an unconstitutional law, and that federal courts lack jurisdiction to enforce unconstitutional statutes. *Ex parte Siebold*, 100 U.S. 371, 377 (1880); *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 724 (2016) (sentence under unconstitutional law is void because state was deprived of authority to impose it); *United States. v. Baucum*, 80 F.3d 539, 540–41 (D.C. Cir. 1996) ("It is true that once a statute has been declared unconstitutional, the federal courts thereafter have no jurisdiction over alleged violations (since there is no valid 'law of the United States' to enforce)[.]"). Thus, as Justices Thomas and Gorsuch observed, it would be highly improper to hold Georgia Power liable for calls that took place during a period of time in which the TCPA as a whole was unconstitutional. *AAPC*, 140 S. Ct. at 2363.

## CONCLUSION

For the foregoing reasons, Georgia Power requests the Court enter summary judgment in its favor and grant any other further relief this Court deems just and appropriate.

[Signature on Following Page]

25

Respectfully submitted this 29th day of October, 2021.

*/s/M. Anne Kaulfold-Wiggins*

M. Anne Kaufold-Wiggins
Georgia Bar No. 142239
Email: awiggins@balch.com

**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Boulevard, N.W.
Suite 700
Atlanta, GA 30308
Telephone:   (404) 261-6020
Facsimile:    (404) 261-3656

Jonathan P. Hoffmann
(Admitted Pro Hac Vice)
Email: jhoffmann@balch.com

**BALCH & BINGHAM LLP**
1901 6th Avenue North
Suite 1500
Birmingham, AL 35203
Telephone:   (205) 251-8100
Facsimile:    (205) 226-8799

*Attorneys for Defendant Georgia Power Company*

## **CERTIFICATE OF COUNSEL REGARDING FONT SIZE**

Counsel certifies that the foregoing has been prepared using Times New Roman font size 14 in accordance with Local Rules 5.1(C) and 7.1(D).

This 29th day of October, 2021.

/s/M. Anne Kaufold-Wiggins
M. Anne Kaufold-Wiggins
Georgia Bar No. 142239

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been filed with the Clerk of Court using the CM/ECF system and served via U.S. Mail First Class, postage prepaid mail and electronic mail to the following on this the 29th day of October, 2021:

Ricky R. Franklin, *pro se*
708 Brambling Way
Stockbridge, Georgia 30281


*/s/M. Anne Kaufold-Wiggins*
M. Anne Kaufold-Wiggins
Georgia Bar No. 142239